927 F.2d 603
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Albert L. BARLOW, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, M.D. Secretary of Health & Human
Services, Defendant-Appellee.
 No. 90-5810.
 United States Court of Appeals, Sixth Circuit.
 March 7, 1991.
 
 On Appeal from the United States District Court for the Middle District of Tennessee, No. 85-01092; Morton, J.
 M.D.Tenn.
 REMANDED.
 Before NATHANIEL R. JONES and DAVID A. NELSON, Circuit Judges, and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff Albert L. Barlow appeals the district court's judgment affirming the Secretary's denial of Social Security disability benefits. For the reasons that follow, we remand for further proceedings.
 
 I.
 
 2
 Barlow filed his applications for disability benefits on November 21, 1984, alleging that he became unable to work on December 31, 1982, due to his disability. The applications were denied initially and upon reconsideration. Barlow requested a hearing and a hearing was held on June 11, 1985. Administrative Law Judge Larry Creson determined that Barlow was not disabled because, despite his impairments, he could perform his former work as a small engine mechanic. The Appeals Council denied Barlow's request for review. Barlow then filed a complaint for review in the United States District Court for the Middle District of Tennessee. The district court remanded the claim to the Secretary for reconsideration in light of changes in administrative procedures as a result of the Disability Benefits Reform Act of 1984, Pub.L. No. 98-460, Sec. 5, 98 Stat. 1801 (1984). On remand, ALJ Henry Kane held a second hearing on October 28, 1987. On January 28, 1988, the ALJ issued a decision unfavorable to Barlow. The Appeals Council denied Barlow's request for review on May 17, 1988, and the case returned to the district court. On February 13, 1990, U.S. Magistrate William J. Haynes, Jr. recommended an affirmance of the Secretary's decision. On February 28, 1990, Barlow's counsel filed objections to the Magistrate's Report. On April 27, 1990, the district court issued an order adopting the magistrate's findings of fact, with minor corrections, and issued new conclusions of law affirming the Secretary's decision.
 
 
 3
 Barlow was born on June 28, 1931, and was fifty-six years old at the time of the ALJ's decision. He attended school for only three months and is unable to read or write. Barlow's past relevant work was as a small engine mechanic fixing aircooled engines for lawnmowers and water pumps. He was last gainfully employed on December 31, 1982, but he made two unsuccessful work attempts as a small engine mechanic in 1983 for two separate employers. J.App. at 85. Both of his former employers submitted statements that Barlow was unable to work due to illness, or his inability to do the job. Id. at 94, 95.
 
 
 4
 In Barlow's original disability applications, he claimed disability due to hypertension and a heart condition. However, the on remand the ALJ considered Barlow's application to be based upon alleged multiple impairments including hypertension, headaches, shortness of breath, chronic lower back pain, double hernias, as well as mental impairments. Id. at 174-77.
 
 
 5
 Barlow's primary treating physician was Dr. Barton Wayne Warner, M.D. Dr. Warner submitted treatment records showing several visits between December 1982 and October 1987. Barlow began seeing Dr. Warner in December of 1982 with complaints of headaches, chest pains and hypertension. Id. at 312. Dr. Warner prescribed medication for hypertension. On January 17, 1983, Dr. Warner conducted a more thorough examination of Barlow. Barlow's chest and heart exam was described as "completely unremarkable," and his electrocardiogram was "within normal limits". Id. Barlow's subsequent treatment records with Dr. Warner indicate that his chest pains and hypertension were partially controlled by medication and that Barlow's symptoms of head and chest pain were usually exacerbated when he would run out of his medication. See, id, at 111-12, 310, 312. On December 5, 1984, Dr. Warner completed a "Chest Pain Questionnaire" in which he indicated that Barlow complained of sharp pain in his left anterior chest, which spread under his left arm and usually lasted a few seconds, sometimes up to a few minutes. Id. at 110. Dr. Warner noted that Barlow had no other associated symptoms, such as nausea, vomiting or sweating, and that there was no evidence of cardiac complications which might impair his physical capacity. Id.
 
 
 6
 Dr. Warner first noted complaints of low back pain in August 1985. Id. at 310. Dr. Warner's notes suggest that Barlow had been having problems with his back "for a long time" and that his visit was precipitated by an incident in which Barlow picked up something heavy and felt pain in his back and burning in his left foot. Id. Dr. Warner noted that Barlow was unable to sit at 90 degrees and that he had "slight tenderness" in his lumbar region and reduced flexibility due to pain. He diagnosed "hypertension [and] low back pain with radiculopathy" and prescribed heat, exercise and some medication. Id. Dr. Warner's subsequent treatment notes in 1986 and a letter concerning a 1987 examination do not make reference to Barlow's back or back pain. Id. at 310, 407. At the request of the Secretary, Dr. Warner did fill out "Medical Assessment" forms in January and March of 1987. On both forms Dr. Warner indicated that he had not seen Barlow for low back pain since August 1985, and was unable to give "an up to date opinion on this matter." Id. at 337, 358. However, on January 27, Dr. Warner stated:
 
 
 7
 If the patient continues to have his low back pain with radiculopathy, then it is my opinion that [Barlow] has some disability to perform tasks involving lifting, handling, or carrying heavy objects. Standing for an eight hour day would also be impaired and prolonged walking.
 
 
 8
 Id. at 337 (Medical Assessment). On March 12, with the same qualifiers, Dr. Warner elaborated that Barlow would have difficulty lifting or handling objects over fifty pounds and "probably couldn't stand for more than a few minutes at a time or walk very far at a time (i.e. 50 ft.)" Id. at 358.
 
 
 9
 Barlow was treated for his back problems in November and December of 1986 by Dr. Oscar T. Johns, an orthopedic specialist. Dr. Johns noted that Barlow reported back problems for twenty years and claimed that they were getting progressively worse. Barlow reported that he could not lift anything weighing more than ten pounds and that if he stood for several hours, he was unable to get up the next day. Dr. Johns' examination revealed that Barlow's forward flexion was painful to thirty degrees, that he held his back rigidly, and that his straight-leg raise test and his nerve-stretch test were positive. However, he noted that Barlow's x-rays were within normal limits and his gait was normal. He diagnosed mechanical low back pain and prescribed exercise and some pain medication. Id. at 331. At a second visit, on November 20, 1986, he again diagnosed mechanical low back pain and administered injections of Depo Medrol. Id. On December 12, 1986, he saw Barlow for the last time and said Barlow was "much improved" from the injection, prescribed steroids and flexion exercises, and advised Barlow to return as needed.
 
 
 10
 In March and May of 1987, Dr. Johns filled out "Medical Assessment" forms. On the March form, Dr. Johns stated that Barlow was "much improved" by the injections, but that no further diagnostic work had been done to determine whether Barlow had a herniated disc. He noted that Barlow had not returned since December 1986 and opined that Barlow was not "a candidate for Social Security benefits on the basis of his back at this time." Id. at 356. On the May form, Dr. Johns again noted that Barlow was much improved after the last treatment and had not returned. However, on this form, he asserted that he could not determine Barlow's work-related activity restrictions because there were insufficient diagnostic tests as to whether Barlow had a herniated disc. Id. at 332.
 
 
 11
 Barlow was also examined by several consultative examiners at the request of the Social Security Administration ("SSA"). In December of 1984, Dr. Frank A. Perry, an internist, examined Barlow. Dr. Perry found that Barlow had a full range of motion in all his joints except in his lubarsacral spine. There were no paravertebral muscle spasms and Barlow's gait was normal. Dr. Perry found Barlow's chest, lungs, heart, and abdomen to be normal, and his vascular and neurological exams were also normal. A resting electrocardiogram was done and a chest x-ray taken and these were normal as well. X-rays of Barlow's back revealed a narrowing of the L5-SI disc with degenerative spurring of Grade 1. Dr. Perry diagnosed hypertension without cardiomegaly on the chest x-ray or left ventrical hypertrophy on the EKG, and osteoarthritis in the lubarsacral spine. Id. at 121-23.
 
 
 12
 Dr. Robert P. Graham, Jr., an internist, examined Barlow for the SSA on December 29, 1986. Examination findings were similar to those of Dr. Perry, although Dr. Graham felt that Barlow's back pain was due to muscle pulls rather than joint or low back pain. Dr. Graham noted that Barlow told him he experienced his low back pain after standing three hours. He noted that Barlow reported that his chest pain and shortness of breath were increased when he walked fast or lifted something heavy. However, Barlow reportedly told Dr. Graham that if he walks slowly and takes it easy, he can walk up to half a mile. Dr. Graham diagnosed hypertension and a history of chest pain and low back pain. In addition, Dr. Graham noted that Barlow had hernias, anxiety and shortness of breath, the later due to his cigarette smoking. Dr. Graham found that Barlow had normal joint functioning in his ankles, knees and hips. As to his back, Dr. Graham found that he could bend fifteen degrees to the right and left and five degrees backward. He could also bend forty-five degrees at the waist if he kept his knees straight. Barlow also could do a deep knee bend and arise without holding on to anything. He was also able to lift a twenty-pound lamp without difficulty and had "no problems handling objects, hearing, speaking, or traveling." Dr. Graham also found Barlow's ability to reason was "normal." Id. at 322-24.
 
 
 13
 Two psychological assessments were obtained in connection with Barlow's applications. Elliott Ward, a clinical psychologist, performed a psychological evaluation on December 14, 1984. He noted, in his statement of Barlow's psychological history, that Barlow had never been hospitalized for psychiatric treatment and had never sought or received psychiatric treatment as an outpatient. Ward also noted that Barlow had reported his last regular employment as a small engine mechanic had ended when his employer "went outta business'." Id. at 118. Testing revealed a full scale I.Q. score of 73, but Ward estimated that based on his discussions with Barlow and his prior history, Barlow's intellectual potential was within the 80 to 89 range. Ward reported that Barlow was consistently capable of understanding, remembering and carrying out simple oral instructions. Barlow reported that he still drove and did his shopping, and that he continued to perform odd jobs as they became available. He mowed the lawn and did other house and yard work during the summer. He also said that he went to town alone to take care of business and that he visited his relatives. While Ward found Barlow to have "perhaps a mild impairment" in his ability to relate to and communicate with supervisors or to compete effectively, he found that Barlow should be able "to respond appropriately and adaptively to ordinary work pressures and demands." Id. at 117-20.
 
 
 14
 On December 30, 1986, Paul Lima, a clinical psychologist, evaluated Barlow on behalf of the SSA. Barlow reported that he was still driving his car and grocery shopping once per week. He also said he visited his mother several times per month, though he said he did not visit with friends or neighbors. He said he was still smoking one and one half packs of cigarettes per day, though his doctor had told him to stop. Lima found that Barlow was "oriented vaguely to time and place, [though] thoroughly to person." Id. at 328. Barlow's conversation was fluent and spontaneous, his mood was normal, and his psychomotor activity was within normal limits. Testing revealed a full scale IQ score of 77. Ward found that Barlow's ability to reason or make occupational, personal or social adjustments was "poor" and he attributed this to Barlow's "lack of education, poor concept formation abilities, poor work history and [a] general dearth of social contacts. Id. at 329.
 
 
 15
 At the administrative hearing in October 1987, Barlow testified that he was no longer able to do his prior work as a small engine mechanic because, due to chest and back pain, he no longer had the ability to lift heavy objects or sustain his former activity. id. at 194, 197, 202 and 216. He testified that he was only able to stand for thirty to thirty-five minutes and that he could only walk thirty-five to forty minutes. Id. at 203-04. He testified that even lifting ten pounds was painful. Id. at 204. He also complained of numbness in his legs from the hips down and dizziness accompanied by headaches. id. at 210-11. He testified that he was only able to sleep three to four hours per night due to pain. Id. at 212. Barlow did note that he sometimes could obtain relief from his symptoms with prescribed medication and Anacin. Id. at 201-02, 210. Finally, he testified that he averaged one "bad day" per week where he was unable to get up or do any activity. Id. at 213-14.
 
 
 16
 Barlow's wife testified at the hearing and basically corroborated Barlow's testimony. Id. at 221-27. Notably, she testified that Barlow no longer did yard work like he used to, could not play with his grandchildren as he would like, and that she frequently heard him groan in the night in pain. Id. at 222, 225.
 
 
 17
 Finally, a vocational expert testified at the hearing that Barlow's past work as a small engine mechanic had a "medium" exertional level and that small engine repair was classified as "skilled" labor. Id. at 228, 230. Most notably, the vocational expert testified that Barlow's prior employment skills were not transferable to other types of work because of his inability to read and write. Id. at 229-31. She also noted that his mental impairments might make it more difficult for Barlow to transfer his skills to other types skilled employment or make a "vocational adjustment." Id. at 231-32.
 
 II.
 
 18
 Our review of a final decision by the Secretary is limited to determining whether the Secretary's decision is supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 401 (1971); Landsaw v. Secretary of Health and Human Services, 803 F.2d 211, 213 (6th Cir.1986). Where substantial evidence supports the Secretary's decision, "we may not even inquire whether the record could support a decision the other way." Smith v. Secretary of Health and Human Services, 893 F.2d 106, 108 (6th Cir.1989). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'." Perales, 402 U.S. at 401 (citation omitted).
 
 
 19
 Regulations promulgated by the Secretary prescribe a five-step sequential review for processing disability benefits claims. See 20 C.F.R. Sec. 404.1520 (1990); see also Farris v. Secretary of Health and Human Services, 773 F.2d 85, 88-9 (6th Cir.1985) (applying five-step analysis). In this case, the Secretary reached the fourth step in the analysis and determined that Barlow was not disabled because he was able to perform his past relevant work as a small engine mechanic. J.App. at 177 (ALJ Decision). Once the Secretary determines that an applicant can perform past relevant work, the applicant will be found to be "not disabled" despite the applicant's impairments. See 20 C.F.R. Sec. 404.1520(e). Thus, our inquiry is limited to whether the Secretary's finding that Barlow can perform his past relevant work is supported by substantial evidence.
 
 
 20
 The vocational expert testified that Barlow's prior work as a small engine mechanic had an exertional level of "medium," and the ALJ determined that Barlow's impairments did not preclude him from performing "medium" work. J.App. at 176. Section 404.1567 defines "medium work" as follows: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." Barlow also points to Social Security Ruling 83-10 which elaborates the on regulations' definiton of "medium work":
 
 
 21
 A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds[.]
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 The considerable lifting required for the full range of medium work usually requires frequent bending or stooping ... Flexibility of the knees as well as the torso is important for this activity ... In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.
 
 
 25
 Plaintiff's Brief at A-48-49 (Ruling 83-10). Barlow asserts that his impairments preclude him from doing medium work as defined by the Secretary.
 
 
 26
 The ALJ determined that taking all Barlow's impairments into account, the evidence suggested that Barlow was able to perform his past relevant work as a small engine mechanic. Without restating all of the ALJ's analysis, we find that the ALJ accurately summarized the medical evidence before it. However, we are unable to determine that its decision was supported by substantial evidence for two reasons.
 
 
 27
 First, the ALJ completely failed to consider the two statements by Barlow's former employers that he was unable to do his former work. After the alleged onset date of Barlow's disability on December 31, 1982, he was employed briefly by two small engine repair companies. Barlow's former employer Leonard W. Riley stated:
 
 
 28
 [Barlow] could not stand up to work. At some times he would have to sit down in the chair and lean against the counter. I had to let Albert go because he could not work very long standing up. So he was laid off.
 
 
 29
 J.App. at 94. Former employer Rick Howse stated: "Albert Barlow worked at S and H Small Engine Repair in 1983. He was under a doctor's care and could not work anymore due to illness." Id. at 95. While the Secretary is not required to discuss in its decision each piece of evidence in the record, see Walker v. Secretary of Health and Human Services, 884 F.2d 241, 245 (6th Cir.1989) (reviewing court may examine all the evidence even if it has not been cited in the Secretary's decision), the employer statements bear directly on Barlow's ability to perform his prior work and should have been considered.
 
 
 30
 Second, we have some concern over the completeness of the Secretary's assessment of Barlow's credibility as to his pain. This court has frequently held that credibility determinations are best left to the trier of fact and that such findings will not normally be disturbed. See, e.g. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir.1987). However, in this case it appears that the ALJ did not consider the effects of Barlow's subjective pain in light of his mental impairments. In Blankenship v. Bowen, 874 F.2d 1116, 1123-24 (6th Cir.1989), this court suggested that a claimant's subjective mental impairments, such as nervousness, anxiety, and depression, must be considered in conjunction with the claimant's subjective physical pain to determine whether the claimant is disabled. In Blankenship, the court noted that while a claimant's medical evidence may suggest that despite his pain he could perform "medium work", this physical pain taken with the claimant's mental impairments might result in disability. Id. at 1123. In making its finding that Barlow could perform his prior work, the Secretary should have addressed the cumulative effects of Barlow's mental impairments on his subjective ability to endure his physical pain.[2]
 
 III.
 
 31
 For the foregoing reasons, we REMAND to the Secretary for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 Barlow raised numerous additional arguments on appeal. However, after careful consideration, we find these arguments to be without sufficient merit to warrant separate discussion